IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| D.C.,<br>on behalf his minor children C.C. and M.C.,<br><br>    Plaintiff,<br><br>  v.<br><br>WALLINGFORD-SWARTHMORE SCHOOL<br>DISTRICT,<br><br>    Defendant. | CIVIL ACTION<br>NO. 17-3832 |

## OPINION

**Slomsky, J.**                    **August 17, 2018**

### I.  INTRODUCTION

On October 10, 2010, a tree fell on the house of D.C. and his minor children, Plaintiffs C.C. and M.C. The house was located at 316 South Providence Road, Wallingford, Pennsylvania in the Wallingford-Swarthmore School District ("District"). On October 17, 2010, the house was condemned, and since that time, Plaintiffs have lived at other properties, including the home of their surrogate mother, Angela Coletta-Presnell, located in Collingdale, Pennsylvania. Despite living outside the District, the children have continued to attend school there. In August 2017, however, the District informed the children's father, D.C., that it would not enroll C.C. and M.C. at the start of the school year because they were not residents of the District.[1]

As a result, D.C. brings this suit, on behalf of his minor children, Plaintiffs C.C. and M.C., against Defendant Wallingford-Swarthmore School District, alleging violations of the McKinney-Vento Homeless Education Assistance Improvements Act of 2001 ("McKinney-Vento

---

[1] Because this litigation commenced on August 25, 2017, the District agreed to enroll the students pending the outcome of the litigation. (Doc. No. 6.) Under federal law, school districts are required to enroll homeless children until their status is resolved in litigation. See 42 U.S.C. § 11432(g)(3)(E)(i).

Act" or "Act"), 42 U.S.C. §§ 11431-11435, as enforceable under 42 U.S.C. § 1983.[2]  Plaintiffs

allege that they are homeless and that Defendant violated the McKinney-Vento Act when they

were notified that they would not be enrolled in the District.[3]  Before the Court is Defendant's

Motion for Summary Judgment.  (Doc. No. 35.)  Plaintiffs have filed a Response in Opposition

(Doc. No. 41), and Defendant has filed a Reply (Doc. No. 43).  On July 24, 2018, a hearing was

held on the Motion.  The Motion is ripe for disposition.

## II.    BACKGROUND

### A.    Factual Background

#### 1.    Living Conditions of Plaintiffs C.C. and M.C.

D.C. and his minor children, Plaintiffs C.C. and M.C., resided in a single family house

located at 316 South Providence Road, Wallingford, Pennsylvania ("Wallingford house") in the

Wallingford-Swarthmore School District.[4]  (Doc. No. 41-7 at 22:13-23:1.)  Based on their

residency, the children attended school in the District since the first grade.  (Doc. No. 41-13.)  On

October 10, 2010, a tree fell on a portion of the Wallingford house.  (Doc. No. 41-7 at 22:13-

---

[2]    The McKinney-Vento Act was passed to "ensure that each child of a homeless individual and each homeless youth has equal access to the same free, appropriate education . . . as provided to other children and youths."  42 U.S.C. § 11431(1).  The Act requires the local educational agency to act in the homeless child's best interest, which may include continuing the child's education in their school of origin for the duration of homelessness.  § 11432(g)(3)(A).

A private cause of action under 42 U.S.C. § 1983 has been recognized for homeless children to enforce their rights under the McKinney-Vento Act.  See Lampkin v. District of Columbia, 27 F.3d 605, 611 (D.C. Cir. 1994).

[3]    The Complaint in Count II also included a claim for a violation of the Individuals with Disabilities Education Improvement Act of 2004 ("IDEA"), 20 U.S.C. §§ 1400 et seq.  In an Order dated January 9, 2018, the Court dismissed this claim because the District is providing C.C. and M.C. with any IDEA services included in their Individualized Education Plans while they are enrolled in the District and therefore no violation of the IDEA had occurred. (Doc. No. 20 at 2, 4-6.)

[4]    On January 28, 2009, Plaintiffs' biological mother passed away at the age of thirty-eight. (Doc. Nos. 41-11, 41-12.)

23:1.)  After the tree fell, the family remained in the house until approximately October 17, 2010 when the township condemned the house.  (Id. at 23:2-11; Doc. No. 41-15.)  After the Wallingford house was condemned, D.C. and his children lived in cars and at the homes of relatives and friends until March 2011.  (Doc. No. 41-7 at 23:15-24, 26:19-23, 31:13-19, 32:11-17.)

From March 2011 to June 27, 2012, D.C. and his children lived in a modular home that D.C. had placed in the rear yard of the Wallingford house.  (Id. at 28:12-23, 31:16-32:16.)  On June 27, 2012, the township obtained a preliminary injunction prohibiting D.C. and his children from living in the modular home behind the Wallingford house.  (Id. at 32:4-22.)  The preliminary injunction provided in relevant part that D.C. "is ENJOINED from using, occupying or habitating within the dwellings located, situated or addressed as 316 South Providence Road, Nether Providence, Pennsylvania."  (Doc. No. 41-17 at 2.)

Thereafter, on approximately June 28, 2012, D.C. and his children began living in vehicles and staying at the house of D.C.'s adult daughter, January Findlow.  (Doc. No. 35-1 ¶ 8; Doc. No. 41-7 at 34:22-35:7.)  Findlow's house is a single-family three-bedroom row home located at 6341 Dicks Avenue, Philadelphia, Pennsylvania ("Dicks Avenue house").  (Doc. No. 41-10 at 8:17-24, 11:19-22.)  Findlow purchased the Dicks Avenue house from her father, D.C., in 2010 or 2011.  (Id. at 11:24-12:4.)  Findlow's six-year-old daughter also lives at the Dicks Avenue house fifty percent of the time.  (Id. at 9:8-17.)  Findlow testified that D.C. and Plaintiffs C.C. and M.C. occasionally "just kind of show up" at the house.  (Id. at 14:3.)  When Plaintiffs stay at Findlow's house, they never stay for more than a couple of days.  (Id. at 15:11-12.)

In her deposition, Findlow testified that it was her understanding that D.C., the father, was not able to reside at the Wallingford house, that he "stays all over," and that he "lives like a

homeless person." (Id. at 17:3-18.) She further testified that D.C. relies on her for money and that he uses her car on a regular basis. (Id. at 18:7-23.) Findlow testified that D.C. uses her car to take the children to and from school. (Id. at 19:3-9.)

In late 2012 or early 2013, Plaintiffs began living occasionally with their surrogate mother, Angela Coletta-Presnell,[5] in a single-family two-story house located at 717 Andrews Avenue, Collingdale, Pennsylvania ("Collingdale house"). (Doc. No. 41-7 at 16:11-16; 35:5-36:3; 38:5-10.) Coletta-Presnell previously lived with D.C. and said in her deposition that she has raised C.C. since he was six-months old and has raised M.C. since he was three or four days old. (Doc. No. 41-9 at 9:2-7, 21:24-22:3.) Although Coletta-Presnell does not have legal custody of Plaintiffs C.C. and M.C., she has visitation with them. (Id. at 14:14-22.)

The Collingdale house has three bedrooms. D.C. testified in his deposition that only two bedrooms are usable because the third bedroom is small and is being used as a closet. (Doc. No. 41-7 at 38:13-39:22.) Delaware County Public Access information provides that the house has three bedrooms, one and a half bathrooms, and is 1,499 square feet in size. (Doc. No. 43-3 at 3.) Coletta-Presnell testified that no one else currently lives with her at the Collingdale house, although in the past, her three children lived there. (Doc. No. 41-9 at 8:2-12.)

Coletta-Presnell testified that the children stay with her three to four nights a week. (Id. at 15:5-7.) D.C. testified that Plaintiffs stay with Coletta-Presnell at the Collingdale house but "have no regular schedule" and will "be there sometimes four days straight and then they might not be there for two days." (Doc. No. 41-7 at 19:1-5.) "It's just back and forth, whenever," D.C. testified. (Id. at 19:5-6.) D.C. and Coletta-Presnell "try to work it out upon everybody's

---

[5] Defendant refers to Coletta-Presnell as Plaintiffs' step-mother, while Plaintiffs refer to her as their surrogate mother. Viewing the facts in the light most favorable to Plaintiffs, the Court will refer to Coletta-Presnell throughout the Opinion as Plaintiffs' surrogate mother.

schedule." (Id. at 19:9-10.) D.C. explained, "First and foremost would be the children's school schedule and then anything else we try to work it around." (Id. at 19:10-13.) D.C. sometimes stays with his children at the Collingdale house. (Id. at 39:23-40:4.)

In her deposition, Coletta-Presnell stated that it was not her expectation that Plaintiffs would ever permanently stay with her. (Doc. No. 41-9 at 23:9-12.) In her sworn Declaration, Coletta-Presnell said that she suffers from "many physical ailments" and is "too old and sick to take on the massive responsibility of having [Plaintiffs] stay with [her] permanently." (Doc. No. 41-28 ¶ 4.) She also stated that she has "done a lot of thinking about this entire situation with respect to the boys and with great reluctance [she] will and must that if [she] is forced in some way to take the boys full-time that [she] would decline because of [her] health." (Id. ¶ 6.) In addition, the docket for the United States Bankruptcy Court for the Eastern District of Pennsylvania reveals that Coletta-Presnell currently is in bankruptcy. (Doc. No. 41-24.)

When Plaintiffs are not staying with Coletta-Presnell in the Collingdale house, they stay with their father, D.C., and Findlow, at the Dicks Avenue house, or occasionally they stay with D.C. at an office located at 2655 South 63rd Street, Philadelphia, Pennsylvania ("63rd Street Office"), which D.C. has owned for about thirty-five to forty years. (Doc. No. 41-9 at 15:12-16:1; Doc. No. 41-7 at 19:23-21:8, 36:18-24, 43:16-22.) Each year, D.C. takes a homestead exemption for the 63rd Street Office. (Doc. No. 41-7 at 75:11-20.) The homestead exemption allows a property owner to receive a real estate tax abatement for that property if he resides in the property and represents that it is his primary residence.[6]

---

[6] Pennsylvania law defines a "homestead" in relevant part as a dwelling that "is primarily used as the domicile of an owner who is a natural person." 53 Pa. Cons. Stat. § 8401. Under Pennsylvania's Homestead Property Exclusion Act, "[t]he governing body of a political subdivision may exclude from taxation a fixed dollar amount of the assessed value of each homestead property in the political subdivision" consistent with certain limitations under the

The 63rd Street Office has no central air conditioning or heating. (Doc. No. 41-7 at 43:3-44:8, 53:7-15.) It has leaking roofs, electricity, and relies on space heaters. (Id.) The children have never complained to Coletta-Presnell about the living conditions there when they are staying with their father. (Doc. No. 41-9 at 17:7, 19:7-13.) D.C. testified that every day, he drives his children to school in the District in either a 1997 Jeep or a Ford Excursion that are owned by Coletta-Presnell. (Doc. No. 41-7 at 44:14-45:1, 105:20-107:7.)

On April 16, 2018, the Wallingford house was listed for sale with ReMax, a real estate broker, for $299,000. (Doc. No. 35-6.) Plaintiffs deny that D.C. listed the home for sale. (Doc. No. 41-3 ¶ 7.) Plaintiffs attached as Exhibit B to their Response in Opposition a Mortgage Agreement as proof that the Wallingford house has a mortgage and that its value is less than the mortgage amount. (Doc. No. 41-8.)

### 2. Relationship Between Coletta-Presnell and D.C. and Ownership of the Collingdale House

Coletta-Presnell began living with D.C. in 2000. (Doc. No. 41-9 at 9:2-7.) She testified that she was never married to D.C., but when asked whether she had a common-law marriage, she stated, "As far as I understood, we had—I guess after seven years, I believe it's considered common law if you live together and reside as man and wife." (Id. at 8:16-9:1.) Similarly, D.C. testified that he believed he had a common-law marriage with Coletta-Presnell. (Doc. No. 41-7 at 12:10-16.) D.C. testified that he and Coletta-Presnell separated around March 2008, while Coletta-Presnell testified that she moved out of the Wallingford house at the end of 2009. (Id. at 14:4-15:13, 60:7-24; Doc. No. 41-9 at 9:11-17.)

---

Act. 53 Pa. Cons. Stat. § 8583(a). An owner of real property seeking to have the property approved as a homestead property for purposes of exclusion must file an application with the assessor for their county. § 8584(a).

On March 16, 2008, as part of their separation, D.C. and Coletta-Presnell handwrote and signed two agreements ("Agreements") regarding the Collingdale house. (Doc. No. 35-8.) The first agreement provides:

> I [Coletta-Presnell] hereby sign over 3 deeds, 2 Felton Street, 1 Dewey Street, which [D.C.] promises in return to put $20,000 towards repairs to the Collingdale house 717 Andrews Ave which [Coletta-Presnell] will keep free and clear. In the event something goes wrong with 717 Andrews [D.C.] promises to make a reasonable and comparable housing for [Coletta-Presnell].

(Id. at 2.) And the second agreement provides:

> This agreement is between [D.C.] and [Coletta-Presnell] as part of a separation between both parties above.
>
> This agreement is for the trade of three properties in Philadelphia PA, 19142, known as
>
> (1)      2636 South Felton St. 19142
>
> (2)      2642 South Felton St. 19142
>
> (3)      2600 South Dewey St. 19142
>
> which three properties will be transferred to [D.C.] with the existing mortgages on all three Philadelphia properties above. And [D.C.] will transfer 717 Andrews Ave. Collingdale PA 19023 to [Coletta-Presnell] free and clear of any mortgage, and [D.C.] will also [sic] up to $20,000.-- to repair her home in Collingdale PA 19023 for the balance of her natural life as a home for her to live in.

(Id. at 3.)

Thus, by the Agreements, Coletta-Presnell transferred to D.C. properties located at 2636 South Felton Street, 2642 South Felton Street, and 2600 South Dewey Street with their existing mortgages, and D.C. transferred to Coletta-Presnell the Collingdale house free and clear of any mortgage for the balance of her natural life. (Doc. No. 41-7 at 119:1-120:9; Doc. No. 41-9 at 11:9-13:18.) D.C. testified that the Agreements were intended to make a "life estate so [Coletta-Presnell] could live at the Collingdale house for life." (Doc. No. 41-7 at 120:3-6.)

Thereafter, on August 11, 2008, Coletta-Presnell transferred the Collingdale house to D.C. "in fee." (Doc. No. 35-9 at 3.) The deed for the transfer was recorded at the Media office for the recording of deeds in Delaware County two days later. (Id.)

Then, years later, by Indenture dated September 7, 2016, D.C. transferred the Collingdale house to himself and Coletta-Presnell, as husband and wife. (Id.) The Indenture provides that it is between D.C., as Grantor, and Coletta-Presnell and D.C., as Grantees. (Id. at 2.) It states in relevant part:

> Grantor for and in consideration of the sum of . . . $48,000 . . . unto him well and duly paid by said Grantee . . . granted, bargained and sold, released and confirmed, and by these presents do grant, bargain and sell, release and confirm unto the said Grantee his heirs and assigns in fee.

(Id.) The Indenture also describes the property. (Id.) Next, it states:

> BEING THE SAME PREMISES WHICH [Coletta-Presnell], BY DEED DATED 08/11/2008 AND RECORDED 08/13/2008 @ THE MEDIA OFFICE FOR THE RECORDING OF DEEDS IN AND FOR THE COUNTY OF DELAWARE DOCUMENT NUMBER # RD BK04415-1979 2008059750 GRANTED AND CONVEYED ONTO [D.C.] IN FEE. AND THIS SAID PROPERTY IS BEING TRANSFERRED FROM HUSBAND TO HUSBAND AND WIFE AND NO TRANSFER TAX IS DUE.

(Id. at 3.) The attached Deed provides that the property is transferred from D.C. to Coletta-Presnell and D.C. (Id. at 5.) Based on the above Indenture, the filing with Recorder of Deeds, and the Deed, as of September 7, 2016, D.C. and Coletta-Presnell became joint owners of the Collingdale house. (Id.; Doc. No. 35-1 ¶ 18.) In addition, Delaware County Public Access information confirms that D.C. and Coletta-Presnell both own the Collingdale house. (Doc. No. 43-3 at 2.)

In his deposition, D.C. acknowledged that the Deed transferred the Collingdale house from him to himself and Coletta-Presnell, as husband and wife. (Doc. No. 41-7 at 114:15-23.) He said, however, that on September 7, 2016, the date of the transfer, he and Coletta-Presnell

were no longer together.  (Id. at 114:24-115:6.)  In his sworn Declaration, D.C. states that he is not permitted to enter the Collingdale house and that he does not have a key to the house.  (Doc. No. 41-36 ¶ 6.)

### 3.  Other Properties that D.C. Owns

Plaintiffs' father, D.C., owns several other properties in the Philadelphia area.  On April 4, 2016, D.C. purchased from an individual named Pat a property located at 2639 South Felton Street.  (Doc. No. 36-1 at 19; Doc. No. 41-7 at 71:15-24, 72:22-24.)  D.C. currently owns this property and testified that he is supposed to make payments to Pat on the property but that he "still owe[s] him a bunch of it."  (Doc. No. 41-7 at 72:6-24.)  D.C. also owns properties located at 2642, 2646, 2648, 2650, and 2657 South Felton Street but testified that each property is uninhabitable.  (Id. at 79:17-82:5.)  D.C. also owns the 63rd Street Office.  (Id. at 43:16-18.)

Defendant conducted inspections of the properties located at 2639, 2642, 2646, 2648, 2650, and 2657 South Felton Street and of the 63rd Street Office and submitted inspection reports for each property.  (Doc. Nos. 37-1, 38-1, 39-1.)  Defendant's inspection report on 2639 South Felton Street notes that the inspector could not inspect the interior of the property because it appeared to be occupied.  (Doc. No. 37-1 at 20.)

Plaintiffs also submitted inspection reports for these properties.  (Doc. No. 41-35.)  Plaintiffs' inspection reports note, however, that the inspector was not able to inspect the interiors of 2639 and 2657 South Felton Street or of the 63rd Street Office.  (Id. at 3, 23, 27.)  The parties do not dispute that there were significant differences between the findings of Defendant's and Plaintiffs' inspectors regarding the habitability of the properties.  (Doc. No. 41-4 ¶ 130; Doc. No. 43-1 ¶ 130.)

### 4. Actions Taken by Defendant to Prevent Plaintiffs from Reenrolling in the District

On March 7, 2016, the Educational Data Systems Manager for the District, Derrick L. Clements, sent a "Notice of Withdrawal Due to Lack of Residency" to D.C. stating that the District had determined that D.C. is not a resident of the District and that, as of the end of the school day on June 17, 2016, his children would no longer be permitted to attend school in the District. (Doc. No. 36-2.) The Notice further stated that D.C. had the right to appeal the residency determination and that to do so, D.C. was required to submit a notice of appeal to Clements by March 25, 2016. (Id.)

At the start of the 2016-2017 school year, D.C. reenrolled the children in school in the District, and the children commenced attending school there. (Doc. No. 1-1 ¶ 35.) The evidence of record does not reveal why he was able to do so. On October 27, 2016, however, Clements sent another Notice to D.C., again stating that the District had determined that D.C. was not a resident of the District, that his children were not eligible to attend school within the District, and that D.C. had the right to appeal the residency determination by filing a notice of appeal by November 11, 2016. (Doc. No. 36-3.)

In response, on November 7, 2016, counsel for D.C. sent a letter to Clements informing him that D.C. was appealing the October 27, 2016 residency determination. (Doc. No. 36-4.) In the letter, counsel for D.C. requested a hearing on the matter. (Id.) On November 28, 2016, counsel for the District responded to the letter from counsel for D.C., stating that it was unclear whether D.C. was contesting non-residence or non-homelessness and that different processes apply to each. (Doc. No. 36-5.) The November 28, 2016 letter provides in pertinent part:

> [F]rom your letter it is not clear which of the District administration's conclusions you are contesting: non-residence or non-homelessness. If the family wishes to assert it is actually currently residing on a regular basis within the bounds of the District and is not homeless, then you are correct that the administration would

need to schedule a School Board level hearing to determine whether that is true. This office would act as counsel for the administration in such a proceeding and counsel from another firm would advise the Board.

On the other hand, if the family concedes that it is not currently residing in the District but believes it should still be considered homeless under the applicable laws, and therefore able to attend the District's schools, then the process will be somewhat different. To move forward with the dispute on the basis of homelessness, the District's homeless liaison will need to conduct a detailed investigation and make a finding. That investigation will require the [C.] family to cooperate, including (but not limited to) giving District personnel access to various properties titled to [D.C.] . . . . Your client would receive notice of the findings from that investigation when complete.

(Id.) It further states: "Please let me know what avenue your client wishes to pursue and we will follow the appropriate process." (Id.) In closing, the letter provides that "during the pendency of either process, the [C.] children will be permitted to remain at the District's schools." (Id.)

On December 16, 2016, counsel for the District sent a follow-up letter to counsel for D.C. informing him that he had not received a response to his November 28, 2016 letter and that if he did not receive a response by December 20, 2016, the District would assume D.C. is claiming his children are homeless and would proceed accordingly. (Doc. No. 36-6.)

Thereafter, on April 7, 2017, the District's Homeless Student Liaison, Laura Bruch, sent a letter to D.C. (Doc. No. 36-7.) In the letter, Bruch stated that based on her investigation, she had determined that D.C.'s children do not qualify as "homeless" as defined by the McKinney-Vento Act and since homelessness was the only basis under which the children had been attending school in the District, they were no longer entitled to continued enrollment. (Id. at 2.) Bruch also stated that D.C. "never actually requested that the District identify [his] children as homeless" but that the children would be permitted to remain in school in the District until the end of the school year. (Id. at 2, 3.)

In the letter, Bruch described her investigation and the evidence she had gathered that supported her determination that Plaintiffs were residing outside of the District and were not

homeless.  (Id. at 2-4.)  She also informed D.C. that he had until April 21, 2017 to file an appeal

of the decision.  (Id. at 5.)  Bruch attached to the letter appeal documents, including the

Procedural Safeguards Notice of Denial of Enrollment, the dispute letter form, and information

on procedures for education of homeless youth.  (Id. at 7-14.)

On August 17, 2017, D.C. sent an email to Clements regarding enrolling his children in

the District for the 2017-2018 school year.  (Doc. No. 36-8.)  The email stated in relevant part:

> Do I have to re register [M.C.] & [C.C.] for September or can they come back
> without going to federal court to get an injunction.  Let me know cus we are
> permitted back on my own property @ 316 s. Providence road 19089.

(Id.)

### B.  Procedural History

On August 25, 2017, Plaintiffs initiated this lawsuit by filing an Emergency Motion for a

Temporary Restraining Order.  (Doc. No. 3.)  That same day, Plaintiffs filed their Complaint.

(Doc. No. 1.)  In Count I, Plaintiffs allege that Defendant violated the McKinney-Vento Act by

failing to follow proper procedures for enrollment of homeless children and by failing to enroll

them in the District.  In Count II, Plaintiffs allege that Defendant violated the IDEA by failing to

provide them with services included in their Individualized Education Plans.  On August 28,

2017, the Court held a telephone conference on the Emergency Motion with counsel for the

parties.  During the telephone conference, counsel for Defendant agreed to re-enroll the children

pending the outcome of this litigation.  The Court then denied as moot Plaintiffs' Emergency

Motion for a Temporary Restraining Order.  (Doc. No. 6.)

On October 26, 2017, Defendant filed a Motion to Dismiss and a Motion to Strike

Plaintiffs' request for attorneys' fees.  (Doc. No. 13.)  On December 19, 2017, a hearing was held

on the Motions.  At the hearing, the Court ruled that it would convert the Motion to Dismiss to a

Motion for Summary Judgment and would allow the parties time to conduct discovery and file

renewed motions for summary judgment. After the hearing, the Court issued an Order granting the Motion to Dismiss the claim in Count I that Defendant violated the McKinney-Vento Act by failing to immediately enroll the children pending resolution of the dispute, denying the Motion to Dismiss the remainder of Count I without prejudice, and converting the Motion to a Motion for Summary Judgment pursuant to Federal Rule of Civil Procedure 12(d).[7] (Doc. No. 20.) As noted previously in footnote 3, the Court granted the Motion to Dismiss Count II, alleging a violation of the IDEA, and the Motion to Strike the request for attorneys' fees.[8] (Id.) The parties proceeded to discovery. After discovery closed, Defendant filed the instant Motion for Summary Judgment, (Doc. No. 35) which is ripe for a decision.[9]

## III.    STANDARD OF REVIEW

Granting summary judgment is an extraordinary remedy. Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In reaching this

---

[7]    Federal Rule of Civil Procedure 12(d) provides:

> If, on a motion under Rule 12(b)(6) or 12(c), matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56. All parties must be given a reasonable opportunity to present all the material that is pertinent to the motion.

[8]    The Court granted the Motion to Strike the request for attorneys' fees because the McKinney-Vento Act does not contain a provision for the award of attorneys' fees and because the Court had dismissed the claim in Count II, alleging a violation of the IDEA, which does contain a provision for the award of attorneys' fees. (Doc. No. 20 at 6.) Accordingly, the Court granted the Motion to Strike the request for attorneys' fees as immaterial. See Fed. R. Civ. P. 12(f) ("The court may strike from a pleading an insufficient defense or any . . . immaterial . . . matter.").

[9]    In deciding the Motion for Summary Judgment, the Court has considered the Complaint (Doc. No. 1), Defendant's Motion for Summary Judgment (Doc. No. 35), Exhibits filed by Defendant (Doc. Nos. 36-40; Inspection Videos, Exs. X, Y, Z, AA), Plaintiffs' Response in Opposition (Doc. No. 41), Exhibits filed by Plaintiffs (Doc. No. 42), Defendant's Reply (Doc. No. 43), and the arguments of counsel for the parties at the July 24, 2018 hearing on the Motion.

decision, the court must determine whether "the pleadings, depositions, answers to interrogatories, admissions, and affidavits show there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Favata v. Seidel, 511 F. App'x 155, 158 (3d Cir. 2013) (quoting Azur v. Chase Bank, USA, Nat'l Ass'n, 601 F.3d 212, 216 (3d Cir. 2010)). A disputed issue is "genuine" only if there is a sufficient evidentiary basis on which a reasonable jury could find for the non-moving party. Kaucher v. County of Bucks, 455 F.3d 418, 423 (3d Cir. 2006) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). For a fact to be considered "material," it "must have the potential to alter the outcome of the case." Favata, 511 F. App'x at 158. Once the proponent of summary judgment "points to evidence demonstrating no issue of material fact exists, the non-moving party has the duty to set forth specific facts showing that a genuine issue of material fact exists and that a reasonable factfinder could rule in its favor." Id. (quoting Azur, 601 F.3d at 216).

In deciding a motion for summary judgment, "[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." Id. (alteration in original) (quoting Chambers ex rel. Chambers v. Sch. Dist. of Phila. Bd. of Educ., 587 F.3d 176, 181 (3d Cir. 2009)). The Court's task is not to resolve disputed issues of fact, but to determine whether there exist any factual issues to be tried. Anderson, 477 U.S. at 247–49. Whenever a factual issue arises which cannot be resolved without a credibility determination, at this stage the Court must credit the nonmoving party's evidence over that presented by the moving party. Id. at 255. If there is no factual issue, and if only one reasonable conclusion could arise from the record regarding the potential outcome under the governing law, summary judgment must be awarded in favor of the moving party. Id. at 250.

## IV.    ANALYSIS

Plaintiffs allege that they are homeless, as defined by the McKinney-Vento Act, 42 U.S.C. § 11434a(a)(A)(B)(1), and that Defendant violated their rights under the Act, as enforceable through 42 U.S.C. § 1983.[10]  Plaintiffs argue that Defendants violated their rights as homeless children by failing to determine whether it would be in their best interest to continue attending school in the District, by refusing to enroll them in the District, and by failing to provide them transportation to the District while they have been homeless and during the pendency of this dispute.

Defendant moves for summary judgment, arguing that Plaintiffs are not homeless as defined by the Act.  Defendant has advanced numerous arguments to support its position that Plaintiffs' living conditions do not amount to homelessness and that Plaintiffs' father, D.C., has the means to provide them housing.  But Defendant's entitlement to summary judgment turns on whether, based on the undisputed material facts, Plaintiffs are homeless within the meaning of the Act.  Thus, the Court's analysis will focus on whether, as a matter of law, Plaintiffs' living conditions by staying three to four nights a week at the Collingdale house qualify them as homeless under the Act, since disputed issues of material fact exist as to whether D.C.'s other properties are habitable.  The Court then will briefly discuss Plaintiff's argument that Defendant has violated the Act by failing to provide them transportation to school in the District during their alleged period of homelessness and during the pendency of this dispute.

---

[10]    42 U.S.C. § 1983 provides in relevant part as follows:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law . . . .

## A.       The McKinney-Vento Act

The McKinney-Vento Act was passed in 1987 "to provide urgently needed assistance to protect and improve the lives and safety of the homeless." Nat'l Law Ctr. on Homelessness & Poverty v. New York, 224 F.R.D. 314, 318 (E.D.N.Y. 2004) (quoting Pub. L. No. 100-77, 101 Stat. 525 (codified as amended at 42 U.S.C. §§ 11431-11435)).  The purpose of the Act, which was reauthorized in 2002 as part of the No Child Left Behind Act, was to "ensure that each child of a homeless individual and each homeless youth has equal access to the same free, appropriate public education, including a public preschool education, as provided to other children and youths." Id. (quoting § 11431(1)).

The Act defines the term "homeless children and youths" in relevant part as:

> **(A)** [I]ndividuals who lack a fixed, regular, and adequate nighttime residence . . . and
>
> **(B)** includes—
>
>> **(i)** children and youths who are sharing the housing of other persons due to loss of housing, economic hardship, or a similar reason; are living in motels, hotels, trailer parks, or camping grounds due to the lack of alternative adequate accommodations; are living in emergency or transitional shelters; or are abandoned in hospitals.

§ 11434a(2)(A), (B)(i).

Under the Act, the local educational agency[11] is required to continue a homeless child's education in the child's school of origin for the duration of homelessness or enroll the child in any public school that nonhomeless students who live in the attendance area in which the

---

[11]   The Act provides that "local educational agency" has the meaning given in 20 U.S.C. § 7801, which defines the term in relevant part as "a public board of education or other public authority legally constituted within a State for either administrative control or direction of, or to perform a service function for, public elementary schools or secondary schools in a city, county, township, school district, or other political subdivision of a State."  § 7801(30)(A).

homeless child is living are eligible to attend. § 11432(g)(3)(A). The Act further provides as follows:

> The local educational agency serving each child or youth to be assisted under this part shall, according to the child's or youth's best interest—
>
>> **(i)** continue the child's or youth's education in the school of origin for the duration of homelessness—
>>
>>> **(I)** in any case in which a family becomes homeless between academic years or during an academic year; and
>>>
>>> **(II)** for the remainder of the academic year, if the child or youth becomes permanently housed during an academic year; or
>>
>> **(ii)** enroll the child or youth in any public school that nonhomeless students who live in the attendance area in which the child or youth is actually living are eligible to attend.

Id. The Act continues:

> In determining the best interest of the child or youth under subparagraph (A), the local educational agency shall—
>
>> (i) presume that keeping the child or youth in the school of origin is in the child's or youth's best interest, except when doing so is contrary to the request of the child's or youth's parent or guardian . . . .

§ 11432(g)(B)(i). The Act defines "school of origin" as "the school that a child or youth attended when permanently housed or the school in which the child or youth was last enrolled, including a preschool." § 11432(g)(I)(i).

The McKinney-Vento Act confers rights on homeless children that are enforceable under 42 U.S.C. § 1983. Lampkin v. District of Columbia, 27 F.3d 605, 611 (D.C. Cir. 1994). Thus, homeless children have a private cause of action pursuant to § 1983 to enforce provisions of the McKinney-Vento Act. Id.; accord Nat'l Law Ctr., 224 F.R.D. at 321.

Here, the parties do not dispute that the District is a local educational agency within the meaning of the Act. 42 U.S.C. § 11434a(3). It also is undisputed that Plaintiffs' school in the

District is their school of origin since it is the school they attended when they lived in the Wallingford house located in the District. § 11432(g)(I)(i). The District also concedes that it "stands ready to continue educating all children that the McKinney-Vento Act defines as homeless," and that if the Court determines Plaintiffs are homeless, it will continue educating them until their status changes. (Doc. No. 43 at 7.) Accordingly, the Court now will discuss whether Plaintiffs' current living situation renders them homeless within the meaning of the Act.

### B. Plaintiffs' Residing at the Collingdale House Three to Four Nights a Week Does Not Render Them Homeless Under the McKinney-Vento Act

Defendant submits that Plaintiffs are not homeless as defined by the McKinney-Vento Act because they have a "fixed, regular, and adequate nighttime residence" available to them at the Collingdale house. (Doc. No. 35-2 at 3.) It also asserts that since the Collingdale house is jointly owned by Plaintiffs' father, D.C., and Coletta-Presnell, Plaintiffs are not "sharing the housing of other persons." (Id.) In response, Plaintiffs argue that they are homeless within the meaning of the Act because Coletta-Presnell has a life-estate in the Collingdale house, D.C. does not have a present ownership interest in the house, and therefore Plaintiffs are sharing the housing of another person. (Doc. No. 41-5 at 5.)

The Court first must determine what interest D.C. has in the Collingdale house. Then, the Court must determine whether, based on D.C.'s ownership of the Collingdale house, Plaintiffs' residing there qualifies them as homeless within the meaning of the Act.

### 1. D.C. and Coletta-Presnell Were Not Married When the Collingdale House Was Transferred to Them, but They Nonetheless Own the House as Joint Tenants with a Right of Survivorship

Although the evidence of record establishes that D.C. and Coletta-Presnell began living together in the year 2000, a genuine issue of material fact exists as to whether they had a common-law marriage. Thus, the Court cannot conclude as a matter of law that D.C. and

Coletta-Presnell were ever legally married. It is undisputed, however, that as part of their separation on March 16, 2008, D.C. and Coletta-Presnell handwrote Agreements that conveyed the Collingdale house from D.C. to Coletta-Presnell for the "balance of her natural life." (Doc. No. 35-8 at 3.) Then on August 11, 2008, Coletta-Presnell transferred the Collingdale house back to D.C. "in fee." (Doc. No. 35-9 at 3.) Finally, on September 7, 2016, by Indenture and Recorded Deed, D.C. reconveyed the Collingdale house to himself and Coletta-Presnell, "as husband and wife." (Id.) Delaware County Public Access information also lists the Collingdale house as being owned jointly by D.C. and Coletta-Presnell. (Doc. No. 43-3 at 2.)

Plaintiffs have come forward with no evidence to dispute the Indenture and Recorded Deed, which provide that D.C. and Coletta-Presnell own the Collingdale house as husband and wife, or the Delaware County Public Access information showing that they both own the property. Thus, the Court must determine what interest D.C. has in the Collingdale house, which the undisputed evidence shows he owns with Coletta-Presnell, as husband and wife, even though he was not married to her at the time of the transfer.

Under Pennsylvania law, it is well-established that tenancy by the entireties "is limited to grantees who are husband and wife." Riccelli v. Forcinito, 595 A.2d 1322, 1325 (Pa. Super. Ct. 1991) (citations omitted). Despite language in a deed that a property is held as husband and wife, "[t]wo people who are not married to one another cannot hold title to land as tenants by the entireties." Id. (citing Masgai v. Masgai, 333 A.2d 861, 863 (Pa. 1975)). In Estate of Reigle, the Pennsylvania Superior Court explained the interpretation of a deed purporting to create a tenancy by the entireties between unmarried people as follows:

> Where the express language of the deed purports to create a tenancy by the entireties and the law will not recognize the estate because the grantees are not husband and wife, the deed is nevertheless valid and does not prevent the grantees

from receiving and holding title as appropriate under the circumstances. <u>Thornton v. Pierce</u>, 328 Pa. 11, 16, 194 A. 897, 899 (1937).

> Where the language of the deed is clear and unambiguous, the intent of the grantees must be gleaned solely from the deed's language. <u>Teacher v. Kijurina</u>, 365 Pa. 480, 486, 76 A.2d 197, 200 (1950). In <u>Pennsylvania Bank and Trust Co. v. Thompson</u>, 432 Pa. 262, 247 A.2d 771 (1962), the Supreme Court reasoned that "a joint tenancy best fulfills an intent to create a tenancy by the entireties because both contain the survivorship feature." <u>Id.</u> at 264, 247 A.2d at 771-772. Therefore, the Court held that where title had been conveyed to two brothers as "tenants by the entireties," the brothers held the real estate as joint tenants with right of survivorship. See also: <u>Maxwell v. Saylor</u>, 359 Pa. 94, 58 A.2d 355 (1948) (conveyance to unmarried man and woman as tenants by the entireties); <u>Hoffert v. Bastian</u>, 54 Pa.D. & C. 146 (Leh.1945) (conveyance to mother and daughter as tenants by the entireties).

652 A.2d 853, 854 (Pa. Super. Ct. 1995) (footnote omitted). In Pennsylvania, where the unmarried parties' "declared intention" is for the property to be granted to the parties, "their heirs and assigns," the deed shows that the parties intended to establish a joint tenancy with the right of survivorship. <u>Maxwell</u>, 58 A.2d at 356.

"A joint tenancy in real estate with right of survivorship is created by the co-existence of the four unities of interest, title, time and possession." <u>Nicholson v. Johnston</u>, 2004 PA Super 279, 855 A.2d 97, 100 (quoting <u>Allison v. Powell</u>, 481 A.2d 1215, 1217 (Pa. Super. Ct. 1984)). In <u>Fenderson v. Fenderson</u>, the Superior Court of Pennsylvania explained the four unities as follows:

> Unity of time requires that the interests of the tenants vest at the same time. Unity of title requires the tenants to have obtained their title by the same instrument. . . . Unity of possession requires the tenants to have an undivided interest in the whole estate. . . . Unity of interest requires the tenants to have estates in the property of the same type, duration and amount.

685 A.2d 600, 607 (Pa. Super. Ct. 1996). "Each joint tenant holds an undivided share of the whole estate." <u>Nicholson</u>, 855 A.2d at 100 (quoting <u>Gen. Credit Co. v. Cleck</u>, 609 A.2d 553, 556 (Pa. Super. Ct. 1992)). Importantly, "[j]oint tenants possess . . . the right to use, to exclude, and to enjoy a share of the property's income." <u>United States v. Craft</u>, 535 U.S. 274, 280 (2002).

Here, viewing the facts in the light most favorable to Plaintiffs, a genuine issue of material fact exists regarding whether D.C. and Coletta-Presnell were common-law married at one point or are still married today. Accordingly, although the Indenture for the Collingdale house provides that on September 7, 2016, it was transferred to D.C. and Coletta-Presnell as "husband and wife," they do not own the Collingdale house as tenants by the entireties because the Court cannot conclude as a matter of law that they were married at the time of the transfer. But regardless of their marital status, the Indenture and Deed still are valid, and D.C. and Coletta-Presnell still jointly hold title to the Collingdale house. See Estate of Reigle, 652 F.2d at 854. Because the language of the Indenture and Deed in this case are clear and unambiguous, D.C. and Coletta-Presnell's intent must be gleaned from solely from their language. See id. (citing Teacher, 76 A.2d at 200).

The Indenture states that the Collingdale property is granted to D.C. and Coletta-Presnell and their "heirs and assigns." (Doc. No. 35-9 at 2.) Based on this language, the declared intention of D.C. and Coletta-Presnell was for the Collingdale house to establish a joint tenancy with the right of survivorship. See Maxwell, 58 A.2d at 356. As such, although the Indenture grants the Collingdale house to D.C. and Coletta-Presnell, as husband and wife, since they were not married at the time of the transfer, the language of the Indenture established a joint tenancy with the right of survivorship.

By the September 7, 2016 transfer, a joint tenancy between D.C. and Coletta-Presnell was created in the Collingdale house since the four unities of interest, title, time, and possession were present. See Nicholson, 855 A.2d at 100. D.C.'s and Coletta-Presnell's interests both vested when the transfer occurred; they obtained their title by the same Indenture and Deed; they had an undivided interest in the whole; and they had estates in the Collingdale house of the same type,

duration, and amount.  See Fenderson, 685 A.2d at 607.  As joint tenants, D.C. and Coletta-Presnell each hold an undivided share of the whole Collingdale house.  Id.  And D.C. and Coletta-Presnell both possess "the right to use, to exclude, and to enjoy the share of the property's income."  See Craft, 535 U.S. at 280.  Thus, as a joint tenant, D.C. has the same rights with respect to the Collingdale house as Coletta-Presnell.

**2.  Plaintiffs' Residing at the Collingdale House Three to Four Nights a Week Does Not Amount to Homelessness Under the McKinney-Vento Act**

Since, as a matter of law, Plaintiffs' father, D.C., is a joint owner of the Collingdale house, the Court now must determine whether Plaintiffs' staying there three to four nights a week qualifies them as homeless under the McKinney-Vento Act.  As noted, the Act defines "homeless children and youths" as "individuals who lack a fixed, regular, and adequate nighttime residence" and includes "children and youths who are sharing the housing of other persons due to loss of housing, economic hardship, or a similar reason."  42 U.S.C. § 11434a(2)(A), (B)(i).

Few courts have had occasion to interpret the meaning of "homeless" under the McKinney-Vento Act.  Courts that have applied this term, however, have consistently held that children living in homes owned or rented by their parents are not homeless within the meaning of the Act.  In J.S. ex rel. S.S. v. Red Clay Consolidated School District, the court denied plaintiffs' motion for a temporary restraining order since they had not met their burden of showing a likelihood of success on the merits, specifically that they were "homeless" while living with their father.  C.A. No. 15-876, 2015 WL 5920316, at *2 (D. Del. Oct. 8, 2015).  Plaintiffs had lived in the school district, but after their mother lost her apartment there, she took them to live with their father in another district, who shared joint custody of plaintiffs.  Id. at *1.  Plaintiffs' father shared an apartment with four adults and a child.  Id.

The court was not persuaded the children became "homeless" under the Act when they moved in with their father.  Id. at *2.  The court stated that interpreting the children's living situation as lacking a "regular, fixed, and adequate nighttime residence" or "sharing the housing of other persons," would "appear to constitute an unprecedented expansion of the reach of the Act" since it would "potentially classify as 'homeless' countless children who move from the home of one parent with joint custody to the home of another parent with joint custody."  Id.  Compare L.R. ex rel. G.R. v. Steelton-Highspire Sch. Dist., No. 1:10-CV-00468, 2010 WL 1433146, at *1, *4 (M.D. Pa. Apr. 7, 2010) (granting preliminary injunction, finding likelihood on success of merits, where minor student and his grandmother temporarily shared a bedroom in the home of relatives, had to abide by the rules of that house, were excluded from a portion of the house, and were at the mercy of the relatives, after his grandmother's house was destroyed by a fire).

In Mangiafico v. State Board of Education, the Connecticut Appellate Court held that where plaintiff and his children were living at a rental property plaintiff owned outside of the district, plaintiff's children were not "homeless" under the McKinney-Vento Act, and thus were not entitled to enrollment in the school district.  53 A.3d 1066, 1076 (Conn. App. Ct. 2012). Plaintiff and his children lived in a home he owned in the school district but moved temporarily to a rental property he owned in another district while their home underwent construction.  Id. at 1070-71.  During the construction, however, heavy rain caused structural damage to the home, rendering it uninhabitable.  Id. at 1071.  Because the family could not return to the home, plaintiff canceled a lease with a prospective tenant for the rental property and continued to reside there.  Id.  Plaintiff claimed his children were entitled to remain in their original school district because living in the rental property rendered them homeless.  Id. at 1076.  The court held that

although plaintiff argued that the property was not "adequate" because it was a rental property, case law does not support this interpretation of "homelessness" under the Act. Id.

Additionally, administrative decisions on appeals of denials of enrollment have held that where a child is not forced to leave a parent's house or where their parent does not lack housing, the child is not homeless under the McKinney-Vento Act. See, e.g., Appeal of K.M. ex rel. L.G., 57 N.Y. State Educ. Dep't, Decision No. 17336, 2018 WL 1326717, at *2-3 (Feb. 28, 2018) (concluding that student who moved from her father's home in the school district to her grandmother's home outside the school district was not homeless under the McKinney-Vento Act or New York law because there was no evidence she was forced to leave her father's house or that her grandmother's house was not a fixed, regular, or adequate nighttime residence); Appeal of D.C. & G.D. ex rel. D.D., D.D., & S.D., 57 N.Y. State Educ. Dep't, Decision No. 17127, 2017 WL 3314398, at *3-4 (July 19, 2017) (dismissing appeal as untimely, but noting that appeal also would have been dismissed on the merits because the children's status living in an apartment for which their uncle co-signed after being evicted from their last apartment did not establish that the housing was inadequate or temporary so as to render them homeless under the McKinney-Vento Act or New York law).

Here, Plaintiffs do not "lack a fixed, regular, and adequate nighttime residence" by living three to four nights a week in the Collingdale house, of which their father has joint ownership. They are not lacking a residence because their father is a joint owner of the Collingdale house and therefore has the legal right to possess and use the home. Indeed, he holds an undivided share of the whole Collingdale house, and even though Plaintiffs stay there three to four nights a week, they have a fixed, regular nighttime residence available to them to stay at full time.

Moreover, no genuine issue of material fact exists that the Collingdale house is not an "adequate nighttime residence." Delaware County Public Access information provides that the house has three bedrooms, one and a half bathrooms, and is 1,499 square feet in size. (Doc. No. 43-3 at 3.) D.C. confirmed through his testimony that it is a three-bedroom home, although he stated that the third bedroom is not usable due to its size. (Doc. No. 41-7 at 38:13-39:22.) In addition, Coletta-Presnell testified that no one else currently lives with her at the Collingdale house. (Doc. No. 41-9 at 8:2-12.) Moreover, Plaintiffs have not come forward with any evidence that the Collingdale house is not an adequate nighttime residence.

Plaintiffs also are not "sharing the housing of other persons" within the meaning of the Act. Their father has a joint ownership interest in the Collingdale house. They are living in the home of their father. Although their surrogate mother, who raised them from infancy, lives there as well, staying in their father's house does not constitute sharing the home of other persons. It would be an "unprecedented expansion of the reach of the Act" to find that Plaintiffs are homeless where they are living in a house jointly owned by their father. See J.S. ex rel. S.S., 2015 WL 5920316, at *2. Although D.C. testified that he is unwelcome in the home, this testimony does not contradict the fact that he has the legal right to possess and use the home. In addition, given the apparent ease with which ownership is transferred and his knowledge of real estate, a strong inference arises that he, not Coletta-Presnell, controls not only who owns the real estate but also who has the right to reside in it. No genuine issue as to any material fact exists that Plaintiffs in this case are not homeless within the meaning of the Act.[12] For this reason, Defendant's Motion for Summary Judgment will be granted.

---

[12] Defendant also contends that Plaintiffs have adequate nighttime residences available to them at the other properties D.C. owns, including the 63rd Street Office and properties at 2639, 2642, 2646, 2648, 2650, and 2657 South Felton Street. (Doc. No. 35-2 at 5-6.) Disputed

C.     **Plaintiffs Have Not Shown that Defendant Failed to Provide Transportation to Them in Violation of the McKinney-Vento Act While They Were Homeless and During the Pendency of this Dispute**

In their Opposition to the Motion for Summary Judgment, Plaintiffs make two arguments regarding Defendant's alleged failure to provide them transportation to school in the District. First, they contend that from October 11, 2010 to April 7, 2010, no transportation was provided for them from the Collingdale house or the Dicks Avenue house to the District in violation of the Act.  (Doc. No. 41-5 at 12.)  Plaintiffs also argue that a genuine issue of material fact exists as to whether a request for transportation was made and that neither they nor their father was informed

---

issues of material fact exist, however, as to whether each of these properties is inhabitable and therefore is an "adequate" nighttime residence.

As to the 63rd Street Office, Defendant's inspection report states that it requires major repair and that there were other dangerous conditions.  (Doc. No. 39-1 at 12.)  And although Defendant argues that D.C. owns four modular units on that property, the inspection reports for each state that they require repair.  (Doc. No. 37-1 at 2-14.)  Plaintiffs' inspection reports for the 63rd Street Office and the units state that they are uninhabitable, and that the units are being used as storage and have not been occupied for a considerable time.  (Doc. No. 41-35 at 28.)  Neither Plaintiffs nor Defendant was able to inspect the inside of 2639 South Felton Street.  (Doc. No. 37-1 at 20; Doc. No. 41-35 at 3.)

As to the properties at 2642 and 2646 South Felton Street, Defendant's inspection reports state that they could be made habitable by turning on the utilities and making repairs but do not state that they are currently habitable.  (Doc. No. 37-1 at 22; Doc. No. 38-1 at 2.)  Plaintiffs' inspection reports on these properties state that they require extensive renovation and are not habitable.  (Doc. No. 41-35 at 9, 13.)  As to the property at 2648 South Felton Street, Defendant's inspection report states that "[d]angerous conditions exist" and describes other problems.  (Doc. No. 39-1 at 6.)  As to the property at 2650 South Felton Street, Defendant's inspection report states that "the property requires major repair" but that it could be made habitable if the utilities are turned on and repairs are made.  (Id. at 9.)  Plaintiffs' inspection reports describe both properties as "needing total renovation work" and "not habitable."  (Doc. No. 41-35 at 17, 21.)

Finally, regarding the property at 2657 South Felton Street, Defendant's inspection report states that "[d]angerous conditions exist" and that it "requires major repair."  (Doc. No. 31-9 at 15.) Plaintiffs were unable to inspect the inside of 2657 South Felton Street because it was occupied and the inspector was not permitted entrance.  (Doc. No. 41-35 at 23.)

Viewing the facts in the light most favorable to Plaintiffs, genuine issues of material fact exist as to whether D.C.'s other properties are habitable as "adequate" nighttime residences.

of transportation services as required by 42 U.S.C. § 11432(g)(6)(A).[13]  (Id.)  Second, Plaintiffs argue that the District is in continued violation of the Act because it has not provided transportation to them during the pendency of this litigation.  In its Reply, Defendant responds that no violation for failing to provide transportation was alleged in the Complaint.  (Doc. No. 43 at 3.)  Regardless, Defendant submits that any allegation that it failed to provide transportation during the period of alleged homelessness is premature unless and until Plaintiffs are determined to be homeless under the Act.  (Id.)

Courts in the Third Circuit have consistently held that a plaintiff may not raise arguments for the first time at summary judgment that were not pled in their complaint.  See McLaud v. Indus. Res., Inc., 715 F. App'x 115, 121 n.5 (3d Cir. 2017) (noting that trial court properly refused to consider a claim that a party did not raise in an amended complaint but introduced for the first time in response to motion for summary judgment (citing Shanahan v. City of Chicago, 82 F.3d 776, 781 (7th Cir. 1996))); Warfield v. Se. Pa. Transp. Auth., 460 F. App'x 127, 132 (3d Cir. 2012) ("A plaintiff may not amend a complaint by raising arguments for the first time in a brief in opposition to a motion for summary judgment." (citations omitted)); Bell v. City of Philadelphia, 275 F. App'x 157, 160 (3d Cir. 2008) (same); Aldinger v. Spectrum Control, Inc., 207 F. App'x 177, 180 n.1 (3d Cir. 2006) (affirming summary judgment for defendants, noting

---

[13]  42 U.S.C. § 11432(g)(6)(A) provides in pertinent part as follows:

> Each local educational agency liaison for homeless children and youths, designated under paragraph (1)(J)(ii), shall ensure that—
>
> * * *
>
> **(viii)** the parent or guardian of a homeless child or youth, and any unaccompanied youth, is fully informed of all transportation services, including transportation to the school of origin, as described in paragraph (1)(J)(iii), and is assisted in accessing transportation to the school that is selected under paragraph (3)(A) . . . .

§ 11432(g)(6)(A)(viii).

that district court properly refused to address plaintiffs' WARN Act claim since it was raised "for the first time in their brief in opposition to [defendant's] motion for summary judgment and . . . was not pled in their complaint").

Here, because Plaintiffs did not allege in their Complaint that Defendant violated the Act by failing to provide them with transportation while they were homeless, and because, as a matter of law, Plaintiffs are not homeless, the argument about the failure to provide transportation is without merit. First, in Count I of the Complaint, even when reading it expansively in the light most favorable to Plaintiffs, they merely allege that Defendant violated the Act by:

> (b) Failing to make a determination as to whether it would be in the children's best interest to continue attending Wallingford-Swarthmore, in accordance with the standard set forth in the McKinney-Vento Act (i.e. that the children continue in their school of origin if feasible unless this is contrary to the wishes of his family). 42 U.S.C. § 11432(g)(3)(A) and 42 U.S.C. § (g)(3)(B)(i) [sic].

> (c) Failing to establish policies and procedures to ensure compliance with the McKinney-Vento Act and to review and revise policies or practices that may act as barriers to the enrollment or attendance of homeless children in the School District, or children's receipt of comparable services as defined in Part B of Title VII of the McKinney-Vento Act. 42 U.S.C. § 11432(g)(1)(F); 42 U.S.C. § 11432(g)(1)(I); § 11432(g)(6)-(7); 42 U.S.C. § 11432(g)(3)(E)(iii).

> (d) Failing to ensure the enrollment and attendance of homeless children and youths who are not currently attending any school in accordance with the Act. 42 U.S.C. § 11432(g)(7)(C).[14]

 (Doc. No. 1-1 ¶ 58.)

The only place in the Complaint where Plaintiffs even discuss transportation services is in paragraph 19 under a section that reads, "Key Provisions of the McKinney-Vento Act and of

---

[14]  In paragraph 58(a) of the Complaint, Plaintiffs also alleged that the District failed "to immediately enroll C.C. and M.C. in Wallingford-Swarthmore, their school of origin, pending resolution of this dispute." (Doc. No. 1-1 ¶ 58(a).)  But because the District agreed to enroll Plaintiffs pending the outcome of the litigation, this claim was dismissed as moot. (Doc. No. 20 at 4.)

Pennsylvania's State Plan."  (Id. ¶ 19.)  Paragraph 19 reads as follows: "The Act also provides that a homeless child shall receive services comparable to services offered to other students in the school selected including transportation services and 'educational programs for children with disabilities.'"  (Id. (quoting § 11432(g)(4)(A), (B).)  But Plaintiffs never allege anywhere as a factual allegation that they were deprived of transportation.  At no point do they actually allege that Defendant violated § 11432(g)(4)(A) by failing to provide transportation for them.  Further, Plaintiffs pled no facts to support an allegation that Defendant failed to provide them transportation or failed to inform them about transportation services.  But even if Plaintiffs had alleged this claim in their Complaint, it still would fail because Plaintiffs are not homeless under the Act, and for this reason, Defendant was not required to provide transportation to them.

Second, Plaintiffs did not allege in the Complaint that Defendant violated the Act by failing to provide them transportation during the pendency of this litigation.  The closest Plaintiffs came to making this allegation was their claim that the District failed to immediately enroll them in the District pending resolution of this dispute in violation of § 11432(e)(3)(E).  By Order dated January 9, 2018, however, this claim was dismissed as moot because the District had agreed to enroll the children while this litigation was ongoing.  (Doc. No. 20 at 4.)  No other allegation regarding the District's duties during the pendency of this litigation was included in the Complaint.  Because Plaintiffs did not make this allegation in their Complaint, they cannot raise it for the first time now.

Plaintiffs rely on N.J. v. New York, 872 F. Supp. 2d 204 (E.D.N.Y. 2011), in arguing that they are entitled to transportation during the pendency of this dispute.  But in N.J., plaintiffs filed a motion for a preliminary injunction together with a motion for an order requiring the school district to provide transportation.  Id. at 207.  Plaintiffs in this case did not seek such relief in

their Emergency Motion for a Temporary Restraining Order (Doc. No. 2) or include this allegation in their Complaint (Doc. No. 1-1).  Accordingly, <u>N.J.</u> is inapposite, and Plaintiffs' argument that Defendant violated the Act by failing to provide transportation during the pendency of this dispute is without merit.  Because Plaintiffs have not pled any allegation in their Complaint that the District failed to provide transportation during the period of alleged homelessness or during the pendency of this dispute, they may not make these arguments for the first time in their opposition to summary judgment.

## V.    CONCLUSION

For all the reasons stated above, Defendant's Motion for Summary Judgment (Doc. No. 35) will be granted.  An appropriate Order follows.